## HALE CO. ET AL. v. UNITED STATES (No. 2195).[1]

1. ARBITRARY RULINGS AND CONDUCT.

　　An importer who imports his goods under a tariff act still in force and declines to await the going into effect of an act carrying a higher rate of duty is strictly within his legal rights, and he should not be hampered by arbitrary rulings or conduct designed to defeat entry at the lower rate.

2. ENTRY AFTER OFFICE HOURS.

　　Where an importer presents his entry within the prescribed hours of the customs office and while on the customs premises is engaged in making amendments to the documents originally presented in order to meet objections made by customs officials, the amended papers, if in proper form, should not be refused by the entry clerk if he is then in his office, on the ground that they are tendered after office hours. The entry clerk may not be bound to remain at his desk after office hours, but if he does wait, he certainly should finish the business the transaction of which was begun in due time and diligently prosecuted.

3. EVIDENCE, WEIGHT, AND SUFFICIENCY.

　　Where the importer's customs broker testified that the entry papers were submitted to the entry clerk before 4.30 p. m., and was contradicted by the deputy collector who gave conflicting testimony as to details, it will be taken that the entry papers were tendered before 4.30 p. m.

4. ENTRY BEFORE DOCKING.

　　Where the vessel bearing the merchandise was within the port limits, the fact that she had not yet docked was not a good reason for rejecting the entry, especially in view of the fact that the particular collector's office had customarily accepted such entries.

5. ILLEGALLY DELAYED ENTRY.

　　A shipment of peanuts arrived in the port of Seattle on May 27, 1921. Entry was attempted on that date in order to avoid the payment of the higher duty under the emergency tariff act of 1921, which went into effect the next day. For specious reasons, contrary to the customs of that office and seemingly to delay the entry until the going into effect of the higher rate, the entry was rejected on May 27, but accepted with unimportant changes on May 28, the certified check offered with the rejected entry on May 27 being retained. The importer was entitled to entry and delivery permit on May 27; the goods, with the exception of samples, were illegally in customs custody on May 28; and they were dutiable under the tariff act of 1913, and not under the emergency tariff act of 1921.

### United States Court of Customs Appeals, May 24, 1923.

APPEAL from Board of United States General Appraisers, G. A. 8541 (T. D. 39156).

[Reversed.]

*Frank L. Lawrence* (*Martin T. Baldwin* of counsel) for appellant.

*William W. Hoppin*, Assistant Attorney General (*Charles D. Lawrence*, special attorney, of counsel) for the United States.

[Oral argument January 25, 1923, by Mr. Charles D. Lawrence.]

Before MARTIN, Presiding Judge, and SMITH and BARBER, Associate Judges.

SMITH, Judge, delivered the opinion of the court:

A consignment of peanuts carried by the steamer *Protesilaus* arrived on May 27, 1921, at the port of Seattle, Wash. At 15 min-

[1] T. D. 39660.

utes past 4 in the afternoon of that date and when the vessel was at Four Mile Rock in the port of Seattle and within 30 minutes of the dock, the Hale Co., by its customs broker, presented to the entry clerk at the customhouse its entry of the peanuts. The entry clerk, after carefully studying the entry, referred it to the deputy collector, who at 4.25 p. m. refused to accept it on the ground that the *Protesilaus* had not arrived at the dock and on the further ground that the entry and the bond for the production of the bill of lading did not show the marks on the bags containing the peanuts or the consignee of the goods.

The customs broker testified that he then went immediately to the customs lobby to telephone to his office for the information which would enable him to amend the papers and that after amendment thereof he presented them to the entry clerk between 4.29 and 4.30 p. m. The bond stated that the Hale Co. was the ultimate consignee of the consignment of peanuts and specified "H" in a triangle as the mark of the goods. The entry as amended named the Hale Co. as ultimate consignee of the merchandise, specified that "H" in a triangle was the mark of the goods, set forth the number of bags of peanuts, the value of the merchandise, the name of the steamer on which it was shipped, and the port of shipment. According to the customs broker the amended entry was definitely rejected by the deputy collector about 4.34 or 4.35 p. m.

On the morning of the 28th the amended entry was accepted at the customhouse without further amendment other than a change of date, the insertion of the letter "S" before the mark "H" in the triangle, and the addition of the words and figures "Seattle from Japan, net 100 lbs." A certified check for duties tendered with the original amended entry on May 27 was received and retained by the customs officials.

The deputy collector of customs testified that the original entry and the bond for the production of the bill of lading were presented before 4.30 p. m. and that bond and entry were finally rejected at 4.25 p. m. because they did not specify the name of the consignee of the merchandise or the marks on the importation. He testified that the customs broker left the office at 4.32 p. m. after the rejection of the original entry and bond; that on May 27, after the office was closed, the entry and bond were again presented; and that on the bond there then appeared an "H" in a triangle, but that it did not show how or to whom the merchandise was consigned. On cross-examination the witness twice stated that the customs broker returned to the entry clerk's office at 4.32 p. m. and that the office was open. Just how the broker could have left the office at 4.32 p. m. and again entered the office at 4.32 p. m., after it was closed, was not explained.

The deputy collector acknowledged that merchandise which came across the border without marks had been admitted to entry and that the customhouse would take entry of fish and perishable goods after 4.30 p. m. He could not remember whether or not he had transacted any Government business after 4.32 p. m., at which hour he claimed the amended entry and bond were presented.

The testimony in this case leaves the impression that the deputy collector of customs had set himself to block the entry of the goods on the 27th of May and to compel the importer to pay the higher rate of duty which went into effect on May 28. Possibly that was not the purpose of the customs official, but if it was, we are constrained to say that it indicated a conception of duty which ought to be abandoned in the interest of fair dealing and an impartial administration of customs business. An importer who imports his goods under a tariff act still in force and declines to await the going into effect of an act carrying a higher rate of duty is strictly within his legal rights, and he should not be hampered by arbitrary rulings or conduct, designed to defeat entry of his goods at the lower rate. Of course, if he arrives at the customhouse after hours and finds it closed for the day, customs officials are not bound to open the doors to resume the transaction of customs business for his convenience or benefit. Where, however, he presents his entry within the hours prescribed and while on the customs premises is engaged in making amendments to the documents originally presented in order to meet objections made by customs officials, the amended papers, if in proper form, should not be refused by the entry clerk if he is then in his office. The entry clerk may not be bound to remain at his desk after office hours, but if he does wait he certainly should finish the business the transaction of which was begun in due time and diligently prosecuted.

It affirmatively appears that it has been the custom at Seattle to receive entries for fish and perishable goods after 4.30 p. m. That is done unquestionably to save the importer from loss and is a sensible recognition of the fact that importers are not enemies of the Government, but citizens entitled to its protection when it can be given without peril to the revenues which the Government has a *lawful* right to collect. The special consideration accorded to some entrants of merchandise should not be denied to others who, presenting their entries in due time, are required to amend them, and who having completed their amendments submit the amended papers to the entry clerk after hours but before he has left his office. To hold otherwise would result in discrimination, favoritism, and an arbitrary use of power. Congress if it wishes can fix the absolute time limit for filing entries, but until it does so administrative officers while still in their offices should not refuse to complete the customs

business which was undertaken in due time and not abandoned by the importer.

But, however that may be, the testimony of the customs broker that the amended entry and bond were submitted to the entry clerk between 4.29 and 4.30 p. m. is contradicted not by the entry clerk, but by the deputy collector, who said that the importer left the office at 4.32 p. m. and returned with the amended papers at 4.32 p. m. Inasmuch as the broker's statement is supported by the fact that the customhouse was not closed and by the fact that the entry clerk received the amended documents for examination, we are of the opinion that the preponderance of the evidence establishes that the amended entry and bond came to the hands of the entry clerk during official hours.

The Government contends that no permit for the delivery of the peanuts was issued to the importer on the 27th of May and that the importation was still in customs custody at the time the emergency tariff act went into effect. That is true, but as entry of the goods was illegally refused and the customs officials received and retained a certified check for the duties, it must be held that the goods were entered on May 7, that the importer was entitled to a permit of delivery on that date, and to the possession of the merchandise, with the exception of samples retained for examination in customs custody. See section 4, emergency tariff act, paragraph Q, tariff act of 1913; United States *v.* Grossfield (1 Ct. Cust. Appls. 189; T. D. 31218).

It was shown by the evidence that the collector's office at Seattle accepts entries of merchandise landed as far out from the center of the city as Salmon Bay Waterway, which is a point about twice as far from pier 14 as is Four Mile Rock, at which point the *Protesilaus* had arrived at the time the entry for the merchandise was originally tendered.

We find no authority whatever for the doctrine that entries of merchandise can not be received until the vessel arrives at the dock. If that were the case vessels that could not approach a dock or which were compelled to discharge their cargoes into lighters would be at a pronounced disadvantage as carriers, inasmuch as entry would be denied until each lighter came to the landing—a practice which, so far as we are advised, has never prevailed in the customs service.

We find, first, that the *Protesilaus* was within the port limits of Seattle at the time the entry was tendered; second, that an entry and a bond for a bill of lading were presented at 4.15 o'clock p. m., and that an amended entry and bond were tendered to the entry clerk and received by him for consideration before 4.30 p. m.; third, that if the amended entry and bond had been presented at 4.32 p. m. they should have been received for filing inasmuch as the entry clerk

was then present in his office and should have concluded the business of making entry begun in due time and not abandoned by the importer; fourth, that the amended entry and bond, having been properly tendered, together with a certified check for the duties, which check was received and retained, the importer was entitled to a delivery permit and the possession of the merchandise with the exception of the percentage held for examination.

The decision of the Board of General Appraisers must therefore be *reversed.*